IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A SAMSUNG SMART PHONE SEIZED ON MARCH 26, 2025, FROM ROBERT LUTES | Case No.   5:25-MJ-5175 |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Matthew A. Eversole, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  Your Affiant makes this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for search warrants authorizing the examination of property—specifically, a Samsung Smart Phone cellular device, which is more particularly described below and in Attachment A respectively (collectively, the "**Subject Device**")—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.  As explained herein, there is probable cause to believe the **Subject Device** was an instrumentality of and will result in the discovery of evidence of violations of Title 21 U.S.C. § 841(a)(1) (Manufacture/Distribution of Controlled Substance) (hereinafter, the "Specified Federal Offenses").

2.  Affiant is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and has been so employed since April of 2021. Your Affiant is currently assigned to Lexington Group III.  Additionally, your Affiant holds a Bachelor of Arts in Physical Education from Berea College located in Berea, Kentucky. Prior to becoming a Special Agent, your Affiant successfully completed the eighteen (18) week basic training conducted at the Department

1

of Criminal Justice Training in Richmond, Kentucky, certifying him as a peace officer in the Commonwealth of Kentucky. After completion of the eighteen (18) weeks, your Affiant was employed by the Lee County Sheriff Office in Beattyville, Kentucky, for approximately eleven months as Patrol Deputy. Your Affiant was employed with the Clark County Sheriff Office in Winchester, Kentucky, for approximately five years and six months. Your Affiant was assigned as a Patrol Deputy for approximately two years and five months. Your Affiant was assigned as a Deputy Detective for approximately three years and six months with the Criminal Investigations Division and Gateway High Intensity Drug Trafficking Area (HIDTA) Task Force. Your Affiant is a graduate of the Criminal Investigator Training Program and the ATF Special Agent Basic Training program, both of which are conducted at the Federal Law Enforcement Training Center in Glynn County, Georgia.

3.     Your Affiant received training and has gained experience in all aspects of law enforcement, including interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer evidence identification, computer evidence seizure and processing, and various other criminal laws and procedures. Your Affiant has not included every detail of every aspect of training, education, and experience, but have highlighted those areas most relevant to this application.

4.     Your Affiant has participated in this investigation and, because of the Affiant's participation and information received from other law enforcement officers, your Affiant is thoroughly familiar with the circumstances of the investigation and the information set forth in this affidavit. The statements contained in this affidavit are based on: (1) your Affiant's personal participation in the investigation; (2) information provided to your Affiant by Special Agents of the ATF and members of state and or local law enforcement; (3) your Affiant's experience and training.

Unless otherwise indicated, all conversations and statements described in this affidavit are related in substance and part. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not set forth all your Affiants' knowledge about this matter.

5. As set forth below, there is probable cause to believe that the below listed **Subject Device** will contain evidence of the Specified Federal Offenses.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6. The property to be searched consists of the following, one Samsung Smart Phone cellular device, IMEI: 353987960074046, described further below in Attachment A and referred to throughout as "**Subject Device.**" The **Subject Device** is currently located at the ATF property room and is further described in Attachment A, which was seized during the serving of a federal search warrant, 5:25-MJ-5128-MAS, and arrest warrant, 5:25-MJ-5129-MAS, on Robert LUTES.

7. The **Subject Device** has been in continuous law enforcement custody since it was seized by law enforcement officers on or about March 26, 2025. The **Subject Device** is currently located in the ATF's possession at its field office in Lexington, Kentucky.

8. The applied-for warrant would authorize the forensic examination of the **Subject Device** for the purpose of identifying electronically stored data particularly described in Attachment B.

## BACKGROUND OF THE INVESTIGATION

9. The United States, including Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and Kentucky State Police (KSP) DESI East, is conducting a criminal investigation of Robert LUTES (hereinafter, "LUTES") regarding possible violations of 21 U.S.C. §§ 841(a)(1).

3

10. In early 2025, a Kentucky State Police (KSP) confidential informant (CI) [1] was developed after Detective Matt Easter, with the Attorney General's Office and Detective Charles Brandenburg, with KSP DESI East approached an individual for an interview. The CI provided information about a person identified as LUTES in Rogers, Kentucky. Information received claimed LUTES was distributing measurable amounts of fentanyl and methamphetamine in and around Lee and Wolfe Counties which resides in the Eastern District of Kentucky. The CI claimed that they had consistently made purchases of fentanyl and methamphetamine from LUTES for more than a year. The CI explained LUTES lives on Big Andy Road in the Rogers, KY area.

## CONTROLLED PURCHASE

11. On February 6th, 2025, investigators utilized a CI to conduct a controlled purchase of suspected fentanyl from LUTES at his residence. The CI arranged the controlled purchase utilizing LUTES' telephone number of (606) 362-2386. Communication between the CI and LUTES occurred primarily through text messaging. Utilizing text messages, the CI inquired whether LUTES was home, and, after LUTES confirmed, the CI notified LUTES that they were on the way. The CI traveled to the residence, entered and met with LUTES. The CI provided LUTES with buy funds in exchange for the suspected fentanyl and two (2) Buprenorphine (Note: Suboxone) film in pharmaceutical packaging. The transaction was video/audio recorded. Upon completion, investigators met with the CI and obtained approximately 3.5 grams of suspected fentanyl, including packaging and the two (2) Buprenorphine film. Based upon Det. Brandenburg's training and experience, the purchased substance is consistent in color and form with fentanyl, a Schedule II controlled substance.

---

[1] Since early 2025, the CI has provided information and conducted multiple controlled purchases involving narcotics and firearms. The CI has not provided any false or deceiving information during the time the CI has been active.

4

12. February 12th, 2025, investigators utilized a CI to conduct a controlled purchase of suspected fentanyl and a rifle from LUTES at his residence. The CI arranged the controlled purchase utilizing LUTES' telephone number of (606) 362-2386. As before, the CI also texted LUTES to confirm that LUTES would be at the residence. After LUTES confirmed, the CI notified LUTES that they would be at the residence in a few hours. Later that same date, the CI traveled to the residence, entered and met with LUTES. The CI provided LUTES with buy funds in exchange for the suspected fentanyl and a rifle. The transaction was video/audio recorded. Upon completion, investigators met with the CI and obtained approximately 7 grams of suspected fentanyl, including packaging and a Marlin, Glenfield Model: 60, .22 caliber rifle, Serial Number: 20534347. Based upon Det. Brandenburg's training and experience, the purchased substance is consistent in color and form with fentanyl, a Schedule II controlled substance.

9. On February 18th, 2025, investigators utilized a CI to conduct a controlled purchase of suspected fentanyl from LUTES at his residence. The CI arranged the controlled purchase utilizing LUTES' telephone number of (606) 362-2386. Through text messages, the CI asks whether LUTES had a "half," referring to a half ounce of fentanyl. After LUTES confirmed, the CI asked for the price. LUTES responded asking whether the CI was asking about "slow or fast," slang terms for fentanyl and methamphetamine, respectively. After the CI indicated "slow," LUTES texts that CI the price of $850. Later that same date, the CI traveled to the residence, entered and met with LUTES. The CI provided LUTES with buy funds in exchange for the suspected fentanyl. The transaction was video/audio recorded. Upon completion, investigators met with the CI and obtained approximately 14 grams of suspected fentanyl, including packaging. Based upon Det. Brandenburg's training and experience, the purchased substance is consistent in color and form with fentanyl, a Schedule II controlled substance.

5

10. On February 25th, 2025, investigators utilized a CI to conduct a controlled purchase of suspected fentanyl from LUTES at his residence. The CI arranged the controlled purchase utilizing LUTES' telephone number of (606) 362-2386. The day prior, February 24, the CI texted LUTES asking whether LUTES had a half ounce of fentanyl for sale. LUTES explained that he did not have that amount at that moment but was planning to pick up more later that evening or the next day. The CI notified LUTES that they would be come to the residence the next day to which LUTES responded through text that he should "have it by tomorrow." The following day, on February 25, the CI traveled to the residence, entered and met with LUTES. The CI provided LUTES with buy funds in exchange for the suspected fentanyl. The transaction was video/audio recorded. Upon completion, investigators met with the CI and obtained approximately 14 grams of fentanyl, including packaging. Based upon Det. Brandenburg's training and experience, the purchased substance is consistent in color and form with fentanyl, a Schedule II controlled substance.

11. On March 5th, 2025, investigators utilized a CI to conduct a controlled purchase of suspected methamphetamine from LUTES at his residence. The CI arranged the controlled purchase utilizing LUTES' telephone number of (606) 362-2386. Prior to the transaction, the CI texted LUTES asking whether LUTES had two or three ounces of "clear," a slang term for methamphetamine. After LUTES confirmed that he had the narcotics, the CI notified LUTES that they would be over to residence in the next few hours. Later, the CI, again, texted LUTES inquiring about the make of a firearm. LUTES replied "to kill take," though investigators believe this was a typographical error, with LUTES likely meaning to have texted "Kel Tec," a brand of firearm. Later that same date, the CI traveled to the residence, entered and met with LUTES. The CI provided LUTES with buy funds in exchange for the suspected methamphetamine. The

transaction was video/audio recorded. Upon completion, investigators met with the CI and obtained approximately 84 grams of suspected methamphetamine, including packaging. The suspected methamphetamine was submitted to the DEA Lab for testing where it was confirmed to be, in fact, methamphetamine with a net weight of 83.51 grams. Additionally, purity analysis showed that the substance was 77% pure with a pure substance weight of 64.3 grams.

12. On March 12th, 2025, investigators utilized a CI to conduct a controlled purchase of suspected methamphetamine and a firearm from LUTES at his residence. The CI arranged the controlled purchase utilizing LUTES' telephone number of (606) 362-2386. The CI traveled to the residence, entered and met with LUTES. The CI provided LUTES with buy funds in exchange for the suspected methamphetamine and firearm. The transaction was video/audio recorded. Upon completion, investigators met with the CI and obtained approximately 114 grams of suspected methamphetamine, including packaging and a Kel-Tec, Model: P-11, 9mm caliber pistol, Serial Number: A5528. The suspected methamphetamine was submitted to the DEA Lab for testing where it was confirmed to be, in fact, methamphetamine with a net weight of 111.34 grams. Additionally, purity analysis showed that the substance was 80% pure with a pure substance weight of 89.07 grams.

## FEDERAL ARREST WARRANT

13. Following the above-described controlled transactions, your affiant applied for and obtained both a federal arrest warrant LUTES (5:25-MJ-5129-MAS) and a search warrant for LUTES's property (5:25-MJ-5128-MAS). On March 26, 2025, both the arrest and search warrants were executed. During the course of the search of LUTES's residence, law enforcement located the following items of evidence: approximately twenty-six firearms (10 rifles, 8 shotguns, 5 revolvers, and 3 pistols), approximately 1,400 assorted rounds of ammunition,

approximately 347 grams of suspected fentanyl/heroin, approximately 428 grams of suspected methamphetamine, approximately 2.6 pounds of suspected marijuana, approximately 245 grams of suspected gabapentin pills, 27 suspected suboxone tablets, 10 suspected clonazepam, drug trafficking equipment, drug paraphernalia, and $7,803 in U.S. Currency. (This is just a brief summary and not a verbatim description of every item seized.) In addition to the search warrant, your Affiant also took LUTES into custody based on the federal arrest warrant. During the arrest of LUTES, investigators recovered the **Subject Device** from LUTES.

14. Your Affiant conducted an audio recorded interview with LUTES. LUTES was advised the Miranda Warnings prior to the interview and waived his rights to speak with your Affiant. LUTES confessed to selling methamphetamine and heroin during the interview. LUTES said he purchased the narcotics from an unknown black male in Lexington and that he had gone to Lexington more than once to purchase narcotics. LUTES further advised he would meet the supplier off Exit 113 in Lexington, Kentucky. LUTES provided investigators with his telephone number of 606-362-2386 which was the same telephone number used by the CI to arrange the above-described controlled purchases. LUTES advised the **Subject Device** was the only phone he had, and LUTES agreed there would be some conversations or texts about narcotics on the **Subject Device**.

15. Based on my training, knowledge, and experience as well as the above information, your Affiant believes LUTES utilized the **Subject Device** to distribute narcotics. Your Affiant knows from training and experience that the evidence discussed above is indicative of illegal drug activity. Based on my training and experience, your Affiant knows that individuals who conspire to traffic in controlled substances require the use of communication, which is mainly via cellular phones. Also, as a local drug trafficker, an individual will use a

cellular phone to distribute their product to their local customers and to contact their source of supply for resupplying. Evidence of narcotics trafficking is commonly found, but not exclusively, in call logs, photographs, voicemails, emails, and text messages, which can be retained on cell phones utilized during the course of a narcotics trafficking conspiracy. It is my experience that individuals will keep photos on their phones of their illegal activity for various purposes. Therefore, it is my belief there is information on the seized **Subject Device** that may contain evidence of illegal drug trafficking, to include identifying co-conspirators. Based on the investigation, LUTES utilized the **Subject Device** to organize the drug transactions with the CI on six separate occasions.

16. Based on the facts stated above, your Affiant believes there is probable cause that the **Subject Device** contains evidence, fruits, and instrumentalities of the Specified Federal Offenses. Based on my training, experience, and research, your Affiant knows that the **Subject Device** has the capability to serve as a wireless telephone, digital camera, recording device, ledger, and possibly a GPS navigation device. Examining data stored on the device of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

17. The **Subject Device** has been stored in a manner in which its content is, to the extent material to this investigation, in substantially the same state as it was when the **Subject Device** first came into the possession of law enforcement officers during the execution of the search and arrest warrants.

## TECHNICAL TERMS

18. Based on my training, experience, and research, your Affiant uses the following technical terms to convey the following meanings:

9

a. Cellular telephone: A cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, cellular telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic films. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards, secure digital cards, or miniature hard drives. Most digital cameras also include a screen for viewing

10

the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media includes various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer

connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs are also often used to facilitate communication between devices through applications that can be downloaded to the PDA. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media includes various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP

    addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

 g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

25. Based on my training, experience, and research, your Affiant knows that the **Subject Device** has capabilities that allows it to serve as cellular telephone, digital camera, portable media player, GPS navigation device, digital data storage device, and/or PDA. In my training and experience, examining data stored on a device, such as **Subject Device,** can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26. As described above and in Attachments A and B, this application seeks permission to search and seize items that the **Subject Device** might contain, in whatever form they are stored. Based on my knowledge, training, and experience, your Affiant knows that electronic devices, such as the **Subject Device**, can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensic tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

27. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the **Subject**

13

**Device** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Device** because:

    a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.    The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Device** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to, computer-assisted scans of the entire medium, that might expose many parts of the **Subject Device** to human inspection in order to determine whether it is evidence described by the warrant.

29. *Manner of execution.* Because this warrant seeks only permission to examine the **Subject Device** already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## REQUEST FOR SEALING AND DELAYED NOTIFICATION

30. It is respectfully requested that this Court issue an order sealing and delayed notification, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. Your Affiant believes that sealing this document and delaying notification is necessary because the items and information to be seized are relevant to an ongoing investigation. Based upon my training and experience, your Affiant has learned that criminals actively search for criminal affidavits and search warrants via the internet and disseminate them to other criminals as they deem appropriate. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## CONCLUSION

31. Your Affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the **Subject Device** described in Attachments A to seek the items described in Attachment B.

Respectfully submitted,

/s/ Matthew Eversole
Matthew A. Eversole
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me by telephone on April __15__, 2025 in accordance with Fed. R. Crim. P. 4.1.

_____
Matthew A. Stinnett
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY